**Walter John DALE, Appellant,**

v.

**STATE of Alaska, Appellee.**

No. 4506.

Supreme Court of Alaska.

Nov. 7, 1980.

Robert S. Spitzfaden, Smith, Taylor & Gruening, Anchorage, for appellant.

Leonard M. Linton, Jr., Asst. Dist. Atty., Larry R. Weeks, Dist. Atty., Anchorage, and Avrum M. Gross, Atty. Gen., Juneau, for appellee.

Before RABINOWITZ, C. J., and CONNOR, BOOCHEVER, BURKE and MATTHEWS, JJ.*

## OPINION

MATTHEWS, Justice.

Walter John Dale was convicted, after pleading guilty, of five counts of sale of cocaine, a violation of AS 17.10.010, and was sentenced to five concurrent five-year terms. He now appeals that sentence.

Dale's conviction was based on the simultaneous sale of three grams to an informant, Larry Wayne, and one gram to an undercover police officer, Charles Adams, on May 9, 1978; a similar simultaneous sale on May 11; and the sale of one ounce, for $2,400, to Adams on May 16. All the sales took place at the Party House in Anchorage, which the state characterizes as "an after-hours gambling and drinking place" run by Dale. Dale explained that he had sold the cocaine, at no personal profit, to Wayne in order to help him through some hard times, and that he sold it to Adams because he was told that Adams was Wayne's cousin.[1] At sentencing, in December, 1978, the state introduced evidence suggesting that Dale was a long-time cocaine dealer who trafficked in relatively large amounts. The sentencing judge expressed disbelief in Dale's version of the cocaine sales.

On appeal Dale raises two claims of error. Dale first argues that the court improperly considered certain evidence in determining the sentence. In particular, he objects to the court's reliance on a previously dismissed indictment for possession of narcotics, which had been based on illegally seized evidence, and on an alleged uncharged cocaine sale. Assuming that consideration of this evidence was error, we find the error to be harmless. The judge explained that he considered the disputed evidence only to test the credibility of Dale's story that he was simply acting as a middle-man and a good Samaritan in supplying narcotics to Wayne and Adams. In view of the substantial uncontradicted evidence presented by the state suggesting that Dale was a "professional" cocaine dealer, we think that the court would have disbelieved Dale's account regardless of any consideration of the controverted evidence.

Secondly, Dale claims that the sentence was excessive in that the court did not consider Dale's nearly certain deportation,[2] which would serve to effectuate the *Chaney* sentencing goals of rehabilitation,

---

* This case was submitted to the court for decision prior to Justice Boochever's resignation.

1. According to Dale, he had met Wayne when Wayne was "down and out." Wayne told Dale that he was the brother-in-law of an old friend of Dale, and Dale took Wayne into his home for a few days. Wayne explained to Dale that he was despondent over problems with his girlfriend, and was thinking of killing her and himself. When Dale next saw Wayne, Wayne was in high spirits, and said that he and his girlfriend had resolved their differences. Wayne then asked Dale if Dale could get him a gram of cocaine, because his girlfriend liked it. Dale said he was "taken aback" by this request, but, in order to keep Wayne happy, asked around among his customers at the Party House and got the requested gram. After this first sale, Dale continued to sell cocaine to Wayne and his "cousin" Adams in response to "repeated and different excuses" until Dale was finally arrested.

2. Dale is a British citizen. He was in fact ordered deported on June 12, 1979, and he has agreed not to appeal the order. Under 8 U.S.C. § 1252(h), deportation cannot take place until Dale is released from prison.

reinforcement of societal norms, isolation and deterrence[3] as well as incarceration would. An examination of the record reveals that Dale's counsel addressed the likelihood and import of Dale's deportation immediately preceding the court's imposition of sentence. It is evident that the judge had the possibility of Dale's deportation in mind when he imposed sentence, and his failure to articulate the role it played in his thinking is not error.[4] We find that the sentence imposed was not clearly mistaken.[5]

AFFIRMED.

RABINOWITZ, C. J., concurs in part and dissents in part.

RABINOWITZ, Chief Justice, concurring in part, dissenting in part.

While I concur in this court's resolution of the impermissible data issue, I cannot agree with the court's holding regarding the deportation issue.

At sentencing, Dale's counsel urged that the objectives of sentencing could be best served by imposing a limited period of incarceration in light of the deportation.[1] Although the superior court considered the *Chaney* goals of rehabilitation, reinforcement of social norms, isolation, and deterrence in imposing a sentence of incarceration, the court never mentioned Dale's pending deportation. Knowledge that the defendant may be deported is one of the considerations which may influence the sentencing court to accord different weight to these goals. In *State v. Tucker*, 581 P.2d 223, 226 n.5 (Alaska 1978), we held that while a sentencing court may not ignore the *Chaney* goals in sentencing an illegal alien who faces deportation, the court may relegate those goals to "secondary importance" in light of the pending deportation.

For this reason, I am of the view that the likelihood of deportation should not be ignored in sentencing and would adopt the holding of *Briscoe v. United States*, 391 F.2d 984, 986–87 (D.C. Cir. 1968) (per curiam), which vacated the sentence that had been imposed because the sentencing judge "did not consider whether rehabilitation (or general achievement of sentencing objectives) was more likely with deportation than with long imprisonment."

Since it does not appear from the superior court's sentencing remarks that it considered the possibility of Dale's deportation, I would vacate the sentence and remand for further sentencing proceedings.[2]

---

**3.** *See State v. Chaney*, 477 P.2d 441, 444 (Alaska 1970).

**4.** Although under the circumstances of this case we do not find it error for the trial judge not to have articulated considerations pertaining to deportation, we believe that generally a judge should specify the manner in which deportation plays a role in the imposition of sentence.

**5.** *See McClain v. State*, 519 P.2d 811, 813–14 (Alaska 1974).

**1.** In his sentencing brief, Dale contended:

The presentence report recommends incarceration 'to isolate the defendant to prevent criminal conduct during the period of isolation, to deter the offenders and others, and because of community condemnation.' Deportation will serve these goals as well as incarceration. Deportation essentially amounts to exile from the Alaskan society. Exile will serve to demonstrate to the defendant and others the seriousness with which the judicial system views drug offenses. Deportation and exile will serve to deter others because it is such a serious punishment, while exile will prevent the defendant from ever again having the opportunity to break the laws of Alaska. Deportation isolates the defendant from the society and prevents further criminal actions. Finally deportation does express societal condemnation by demonstrating that society's views are strong enough in regard to drug offenses to require that the defendant never again enter the society whose drug laws he broke. [citation omitted]

He raised essentially the same point during argument at sentencing. After sentencing, Dale made a motion to the superior court to relax the time standards for submitting a Rule 35(a) motion to reduce sentence in view of his ordered deportation and the request of the British Consulate that Dale be deported rather than serve his sentence. The motion was denied.

**2.** From the superior court's silence concerning deportation, the majority concludes that "[i]t is evident that the judge had the possibility of Dale's deportation in mind . . . ." In my view, such reasoning creates an incentive for the sentencing court to refrain from articulating reasons for imposing a particular sentence,

since silence will be interpreted as indicative of thoughtful consideration. It also discourages defense counsel from raising such arguments, since, as here, this is considered significant by the majority in concluding that this factor was taken into account. Admittedly, the majority's conclusion makes our sentence review tasks easier, but only at the expense of reasoned sentencing decisions. In other (non-deportation) contexts, our decisions have demonstrated a reluctance to rely on a presumption of consideration of sentencing factors in the absence of some articulation. *See Szeratics v. State*, 572 P.2d 63, 67 (Alaska 1977) (Where sentencing court did not indicate reliance on *Chaney* criteria, and there was a basis for belief that improper factors were considered, remand for consideration of all *Chaney* criteria was necessary even though it could be inferred from the record that some of those criteria were considered.); *Andrews v. State*, 552 P.2d 150, 154 (Alaska 1976) ("Our review of the record has led us to the conclusion that the sentencing court's stated reasons for imposing the sentence it did upon Andrews are lacking in the requisite degree of completeness which is required for effective appellate review of sentences.").